UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CHRISTOPHER CARINI,<br>*Plaintiff*,<br><br>v.<br><br>JACOBS ENGINEERING GROUP, INC.,<br>*Defendant*. | No. 3:22-cv-787 (JAM) |

**RULING GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Christopher Carini used to work as an electrical technician for defendant Jacobs Engineering Group, Inc. In this lawsuit, he alleges that one of his female supervisors sexually harassed him during his time with the company. He further contends that after he rejected her advances and complained to another supervisor, the supervisor retaliated against him by reassigning him to a late-night shift. According to Carini, his reassignment created a serious problem because he suffers from narcolepsy that makes it dangerous for him to drive at night. Even though he told the supervisor that he had narcolepsy, she did not switch him back to the early shift and told him he would have to resign if he could not work the late-night shift.

So Carini resigned and later filed this lawsuit. He alleges four claims for sexual harassment discrimination, retaliation, disability discrimination, and failure to accommodate his disability. The company now moves for summary judgment on all claims. For the reasons that follow, I will grant in part and deny in part the company's motion.

**BACKGROUND**

I set forth the following facts based on the summary judgment record and as viewed in the light most favorable to Carini as the non-moving party. Carini began working for the

1

company in August 2019.[1] He was initially hired as an electrical technician through a temporary staffing agency, before ultimately becoming an employee in January 2020.[2] Carini was interviewed for his position by Cindy Corcoran and Dave Petrosky, two of the company's managerial employees.[3]

During that initial interview, Corcoran made a variety of comments about Carini's physical appearance.[4] She complimented Carini's tattoos, and further told him that he had "big arms" and was a "real workhorse."[5] In the same conversation, Carini informed Corcoran and Petrosky that he suffered from narcolepsy and was not supposed to drive at night.[6] Carini was hired and assigned to the early shift running from 7:00am to 3:30pm.[7]

After Carini began work, Corcoran continued to comment on his appearance. According to Carini, "almost every day" she would tell Carini that he was handsome, or that she liked his eyes and tattoos.[8] She also bought him lunch several times per week, offered him tools to take home, and gawked at him during the company's beginning-of-the-day "stretch and flex" program.[9] On one occasion, she complimented his arms and tried to touch them, an action that Carini made clear was unwelcome, stating "I don't want that, get the fuck out of here."[10]

Eventually, Corcoran invited Carini to dinner. But he rejected the invitation, explaining that "I don't really want to do that, I have a girlfriend, [and] I'm not really interested in you like that."[11]

---

[1] Doc. #31-2 at 1 (¶ 1).
[2] Id. at 1 (¶¶ 1-3).
[3] Doc. #31-4 at 40. Defendant's briefing identifies the supervisor by the name of "Dave Perkosi." Doc. #28-1 at 10.
[4] Doc. #31-2 at 8 (¶ 27).
[5] Ibid.; see also Doc. #31-4 at 41.
[6] Id. at 71, 74-75, 77.
[7] Doc. #31-2 at 4 (¶ 13).
[8] Id. at 9 (¶¶ 32-33); Doc. #31-4 at 53-54.
[9] Id. at 52-55; see also Doc. #31-2 at 10-12 (¶¶ 39, 44, 48).
[10] Id. at 12 (¶ 53); Doc. #31-4 at 52, 61.
[11] Doc. #31-2 at 13 (¶ 56); Doc. #31-4 at 62-63.

While Carini never lodged any sort of formal complaint against Corcoran, he mentioned his discomfort to his other supervisor, Petrosky, shortly before Corcoran invited him to dinner.[12] During that conversation, he told Petrosky "she's kind of crazy, I don't know why she likes me so much but I have a girlfriend, I don't get why she keeps doing this stuff."[13] Petrosky responded that he would discuss the matter with Corcoran.[14]

About a week after Carini turned down Corcoran's dinner invitation, Corcoran reassigned him to a different shift.[15] Going forward, Corcoran informed him, he would work from 2:30pm to 11:00pm.[16] She attributed this reassignment to staffing shortages and told Carini that she needed him to fill in.[17] Carini expressed hope that the change would not be permanent.[18] He reminded Corcoran that he suffered from narcolepsy and was not supposed to drive at night.[19] Corcoran's response was to "get a bunch of Red Bulls."[20]

Carini worked the late shift for a few weeks.[21] Shortly after the shift change, he tried carpooling to work with his friend and fellow employee Mike Dorsey.[22] But Corcoran told him that the company wanted employees to drive to work separately, in case one had to unexpectedly leave.[23] Carini repeatedly asked about when he would return to the earlier shift—initially, he was

---

[12] *Ibid.*
[13] *Id.* at 63.
[14] *Ibid.*
[15] *Id.* at 62, 70; Doc. #31-2 at 4 (¶ 14).
[16] Doc. #31-4 at 82.
[17] *Id.* at 70, 80.
[18] Doc. #31-4 at 70, 76, 80; Doc. #31-2 at 5 (¶ 17).
[19] Doc. #31-4 at 71, 76, 80, 85; Doc. #31-2 at 5 (¶ 17). The company mischaracterizes the record by claiming that Carini "admittedly did not tell anyone at Jacobs that he could not drive at night due to his medical condition," Doc. #28-1 at 20. In fact, Carini testified at his deposition that he told Corcoran that "I have narcolepsy, [and] I'm not supposed to drive at night." Doc. #31-4 at 76; *id.* at 80 (Carini testimony that he told Corcoran when she switched him to the second shift that "I have narcolepsy and that's going to be tough to drive").
[20] Doc. #31-4 at 76, 80.
[21] *Id.* at 69.
[22] *Id.* at 79-80.
[23] *Id.* at 80.

told that he would go back to the first shift when the company found a replacement.[24] But Corcoran eventually informed him that he would have to resign if he wanted to leave the second shift.[25]

After it became clear to Carini that he was stuck on the late shift, he decided to resign.[26] He felt that it was unsafe for him to work the second shift because he could not avoid hazardous night driving.[27] So he packed up his belongings and stopped showing up to work.[28] He subsequently explained his decision to Human Resources when they inquired about his absence.[29]

Carini later sued Jacobs in Connecticut Superior Court. He alleged four claims under the Connecticut Fair Employment Practices Act ("CFEPA") for a hostile work environment (Count One), retaliation (Count Two), disability discrimination (Count Three), and failure to accommodate a disability (Count Four).[30] The company removed the case to this Court and now seeks summary judgment on all four of Carini's claims.[31]

## DISCUSSION

The principles governing my review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough to

---

[24] *Id.* at 76, 140.
[25] *Id.* at 139-40.
[26] *Id.* at 76, 81.
[27] *Id.* at 81.
[28] *Id.* at 88.
[29] *Id.* at 87-88; Doc. #31-2 at 6-7 (¶¶ 22-23).
[30] Doc. #1-1 at 5-8 (¶¶ 35-57).
[31] Doc. #28.

allow a reasonable jury to decide the case in favor of that party. If so, I must deny summary judgment. My role at this stage is not to judge the credibility of witnesses or to resolve close and contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (*per curiam*); *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 227-28 (2d Cir. 2024).

Carini brings each of his claims under CFEPA. *See* Conn. Gen. Stat. § 46a-60 *et seq.* CFEPA prohibits discrimination in employment based on a number of characteristics, including discrimination by reason of sex or disability. *See id.* at § 46a-60(b). CFEPA includes sexual harassment as a form of sex discrimination and defines sexual harassment to mean "any unwelcome sexual advances or requests for sexual favors or any conduct of a sexual nature when (A) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (B) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (C) such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment." *Id.* at § 46a-60(b)(8).

In evaluating claims for discrimination under CFEPA, Connecticut courts are generally guided by the cognate requirements of federal anti-discrimination laws such as Title VII of the Civil Rights Act of 1964. *See O'Reggio v. Comm'n on Hum. Rts. & Opportunities*, -- A.3d --, 2024 WL 3628003, at *4 (Conn. 2024). "Hostile work environment claims brought under Title VII and CFEPA are governed by the same standard." *Riggins v. Town of Berlin*, 2024 WL 2972896, at *2 n.5 (2d Cir. 2024).

***Hostile work environment (Count One)***

Count One of the complaint alleges that Carini was subject to unlawful discrimination in the form of a sexually hostile work environment. Under CFEPA, a plaintiff may prevail on a sexually hostile work environment claim if they demonstrate that "the workplace [was] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Patino v. Birken Mfg. Co.*, 304 Conn. 679, 699 (2012).

Specifically, in order to prevail on his claim of a sexually hostile work environment, Carini must show (1) that subjectively Carini personally perceived the environment to be abusive; (2) that objectively the environment was actually hostile and abusive; (3) that the hostile work environment was because of sex; and (4) that the hostile work environment is attributable to his company employer. *See ibid.*; *Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 101-02 (2d Cir. 2020).

Here, the record shows that there is at least an issue of material fact as to each of these four elements. As to the first element (that "the plaintiff subjectively perceived the environment to be abusive"), Carini attests that Corcoran's comments made him uncomfortable, that he was upset that the company did not address Corcoran's harassment, that other employees made fun of him because of the harassment, and that he complained about the situation to one of his supervisors.[32] This evidence is enough to create at least an issue of fact as to whether Carini subjectively considered his environment abusive.[33]

---

[32] Doc. #31-4 at 40-41, 62-63, 82.

[33] The company suggests that Carini's testimony on this subject is not credible. Doc. #28-1 at 16. It points out that Carini made efforts to help his friend, Mike Dorsey, gain employment with the company, and so he must not have perceived the environment to be hostile. *Ibid.* This argument ignores that Carini does not claim that the company was hostile to *all* male employees, but only to him because of Corcoran's personal attraction to him. In any event, my role at this stage of the proceedings is not to weigh Carini's credibility.

The second element (that "objectively the environment was actually hostile and abusive") is a closer question, but there is at least a dispute of fact as to this element as well. The Second Circuit has instructed that "[w]hether a particular environment is objectively 'hostile' or 'abusive' can be determined only by looking at *all* the circumstances," and that such circumstances may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," and that "no single factor is required." *Moll*, 94 F.4th at 229.

Here, Corcoran's conduct was not as shocking as some other examples in the caselaw, but—according to Carini—it occurred with exhausting frequency. Carini testified that Corcoran made "daily" comments about his physical appearance, on top of a variety of other romantically suggestive actions.[34] A jury crediting his testimony could reasonably conclude that the sheer frequency and volume of acts and remarks rendered the environment abusive, even if no specific act or comment was particularly egregious. *See Patino*, 304 Conn. at 704 (upholding hostile work environment claim on the ground that "derogatory comments were made multiple times per week, sometimes several times a day, over a prolonged period of time, despite the plaintiff's repeated complaints to his supervisors"); *see also Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 91-93 (1st Cir. 2018) (district court erred in granting summary judgment on age-based hostile environment claim when plaintiff was referred to as "vieja" or "worthless" nearly every day during her employment); *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1153 (11th Cir. 2020) (ten disparaging remarks about plaintiff's national origin over two months sufficient to make harassment "pervasive").

---

[34] Doc. #31-4 at 53-55.

Arguing to the contrary, the company points to a number of cases—including some from the Second Circuit—in which courts have refused to find a hostile work environment despite grossly inappropriate behavior. *See, e.g.*, *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998) (comment about employee's buttocks and deliberate touching of her breasts with papers were too "isolated and discrete" to pervade employee's work environment); *but see Moll*, 94 F.4th at 234-35 (ruling that there was genuine issue of fact of objectively hostile work environment in light of repeated abusive acts and comments but without evidence of physically assaultive conduct). The record here is enough to support a jury verdict that Corcoran as Carini's supervisor made his work environment objectively hostile and abusive by means of nearly daily sex-based acts and comments that pervaded Carini's worklife.

As to the third element (that "the hostile work environment was because of the plaintiff's protected status"), there is at least a genuine issue of fact regarding whether Corcoran's alleged harassment was sex-based. Here, a jury crediting Carini's testimony could fairly conclude that Corcoran's behavior—showering Carini with compliments on his appearance, leering at him during "stretch and flex," trying to touch his arm, and inviting him to dinner—was motivated by romantic or sexual interest. And harassment geared toward establishing a sexual or romantic relationship is treated as harassment "because of" sex. *See Perez-Cordero v. Wal-Mart Puerto Rico, Inc.*, 656 F.3d 19, 28 (1st Cir. 2011) ("when harassment is motivated by a failed attempt to establish a romantic relationship, the victim's sex is inextricably linked to the harasser's decision to harass"); *Deprey v. FedEx Freight, Inc.*, 2020 WL 1702335, at *5 (D. Conn. 2020) ("[t]here is a genuine dispute of material fact . . . as to whether [plaintiff's] coworkers' comments were motivated by sexual desire and thus were 'because of' [plaintiff's] sex); *Gonzalez-Santos v.*

*Torres-Maldonado*, 839 F. Supp. 2d 488, 497 (D.P.R. 2012) ("a jury could rationally find that the alleged harassment was based upon sex because of [defendant's] romantic advances").

As to the fourth element (that "the hostile work environment is attributable to the employer"), it is not disputed that Corcoran was Carini's supervisor and that her harassing conduct was therefore automatically attributable to the company. "If a supervisor's harassment culminates in a tangible employment action, such as termination, demotion, or an undesirable reassignment, liability for the supervisor's action is automatically imputed to the employer." *O'Reggio*, 2024 WL 3628003, at *5 (citing *Vance v. Ball State University*, 570 U.S. 421, 432 (2013)).

In short, if I view the facts in the light most favorable to Carini as the non-moving party, I must conclude that a reasonable jury could find for Carini on each element of his hostile work environment claim. Therefore, I will deny the company's motion for summary judgment on Carini's hostile work environment claim.

### *Retaliation (Count Two)*

Count Two of the complaint alleges that Carini was subject to unlawful retaliation for reporting and opposing sexual harassment as well as for requesting a reasonable accommodation for his narcoleptic disability. CFEPA protects employees not only from being subject to discrimination on the basis of their protected status but also from being subject to retaliation because they have complained about or opposed being subject to discrimination in the first place. Like claims for discrimination, claims for retaliation under CFEPA are subject to the familiar *McDonnell Douglas* burden-shifting framework. *See Bentley v. AutoZoners, LLC*, 935 F.3d 76, 88 (2d Cir. 2019) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

First, to establish a *prima facie* case, the plaintiff must show (a) that they engaged in protected activity (*e.g.*, that they opposed or complained about discrimination), (b) that the employer took adverse action against the plaintiff, and (c) that there was a causal connection between the protected activity and the adverse action. *See Carter v. TD Bank, N.A.*, 2024 WL 2828470, at *3 (2d Cir. 2024). Implicit in these requirements is that the employer was aware of the plaintiff's engaging in protected activity and that the employer either understood or could reasonably have understood that the plaintiff's protected activity was directed at discriminatory conduct. *See Iwelu v. New York State Off. of Mental Health*, 2024 WL 2175938, at *4 (2d Cir. 2024).

If the plaintiff carries their burden to establish a *prima facie* case, then the burden shifts to the employer to provide evidence of a legitimate, non-retaliatory reason for the adverse employment action. *See Carter*, 2024 WL 2828470, at *3. And if the employer carries this burden, then the burden shifts back to the plaintiff to show that an intent to retaliate was a but-for cause of the adverse employment action, *i.e.*, that the adverse action would not occurred absent the retaliatory motive, even if there may have been other reasons as well for the adverse action. *Ibid.*

As an initial matter, it is clear that there is no genuine issue of fact to support Carini's claim that the company retaliated against him merely because of his request for a reasonable accommodation for his disability (*i.e.*, his request to be moved back to the first shift). Carini points to no evidence that the company took any action at all in response to his request to be moved back to the first shift; all the company did was to refuse the request. Thus, even if the company's inaction amounted to an unlawful failure to accommodate his disability (an issue separately discussed below), there is no evidence that the company's inaction was meant to

retaliate against Carini because of the fact that he had requested a reasonable accommodation. Accordingly, I will grant the company's motion for summary judgment as to Count Two of the complaint to the extent that it alleges a claim for retaliation because Carini sought a reasonable accommodation for his disability.

By contrast, I reach a different result as to Carini's retaliation claim that is based on Carini's reporting and opposition to sexual harassment. As to the first prong of Carini's *prima facie* case (whether Carini engaged in protected activity), he claims he did so when he complained to Petrosky, another managerial supervisor, about Corcoran's sexually harassing conduct. The scope of "protected activity" under CFEPA extends not only to formal complaints about discrimination but also to any other act of opposing discrimination. *See* Conn. Gen. Stat. § 46a-60(b)(4) (making it unlawful "[f]or any person, employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because such person has *opposed* any discriminatory employment practice or because such person has filed a complaint or testified or assisted in any proceeding under section 46a-82, 46a-83 or 46a-84" (emphasis added)).

When an employee informally complains to a supervisor about another supervisor's discriminatory conduct, that employee has engaged in the protected activity of opposing discrimination. "[P]rotected activity may consist of informal actions such as 'making complaints to management.'" *Hatch v. Brennan*, 792 F. App'x 875, 879 (2d Cir. 2019) (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 317 (2d Cir. 2015)); *see also Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990) (interpreting Title VII's anti-retaliation protection for acts of opposition against discrimination to extend not only to formal complaints but also informal complaints to management).

11

The company argues that Carini's complaint to Petrosky was made in passing and was too ambiguous to constitute a complaint about sexual harassment. But Carini testified at his deposition that he told Petrosky that "she's kind of crazy, I don't know why she likes me so much but I have a girlfriend, I don't get why she keeps doing this stuff. And he agreed and then he said he was going to talk to her about it." [35] A reasonable jury could conclude that Carini was complaining to Petrosky about Corcoran's sexual harassment.

Carini also engaged in protected activity when he rejected Corcoran's dinner invitation (to the extent that the jury could conclude that this dinner invitation had sexual overtones). The law on this point is less clear because the Second Circuit to date has reserved ruling on the question "whether declining a sexual advance counts as opposing an unlawful employment practice." *Reed v. Fortive Corp.*, 2024 WL 1756110, at *2 (2d Cir. 2024). In the meantime, other courts have split on the question. *See Williams v. New York City Dep't of Educ.*, 2019 WL 4393546, at *11 (S.D.N.Y. 2019) (collecting cases).

On balance, I am persuaded under the plain meaning of what it means to "oppose" an unlawful act of discrimination that when an employee rejects a supervisor's unwanted sexual advance, the employee is surely opposing unlawful sexual harassment discrimination. "The prohibition against retaliation is intended to protect employees who resist unlawful workplace discrimination," and "[s]exual harassment by an employer or supervisor is an unlawful practice, and an employee's refusal is a means of opposing such unlawful conduct." *Little v. Nat'l Broad. Co.*, 210 F. Supp. 2d 330, 386 (S.D.N.Y. 2002).

Indeed, as other courts have recognized, a failure to recognize such conduct as an act of opposition to discrimination would overlook the unfortunate reality of workplace power

---

[35] Doc. #31-4 at 63.

dynamics: "An individual who is sexually harassed by her supervisor, or someone with clout within the company, faces a Hobson's choice—she is either forced to endure her supervisor's unwanted overtures, or file a complaint that will inevitably bruise his ego and jeopardize her job and career." *Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 448 (S.D.N.Y. 2018); *Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, 85-86 (E.D.N.Y. 2020) (same).

In short, there is a genuine issue of fact that Carini engaged in protected activity when he complained to Petrosky and again when he rejected Corcoran's dinner invitation. Accordingly, there is a genuine issue of fact to support the first prong of Carini's *prima facie* case as to protected activity.

As to the second element of the *prima facie* case (whether Carini was subject to an adverse action), Carini claims that he was subject to adverse action when Corcoran changed him from the day shift to the night shift. An adverse action for purposes of a retaliation claim is one that might dissuade a reasonable employee from making or supporting a charge of discrimination. *See Sharikov v. Philips Med. Sys. MR, Inc.*, 103 F.4th 159, 170 (2d Cir. 2024); *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015). Although a change in job shift may not ordinarily constitute an adverse action, it may rise to the level of an adverse action if there is evidence to suggest that the change imposes an unusual burden on the employee. *See Renondeau v. Wildlife Conservation Soc'y*, 2024 WL 1156643, at *11 (S.D.N.Y. 2024). In light of Carini's narcoleptic condition, a reasonable jury could conclude that Corcoran subjected Carini to an adverse action when she changed him to the night shift. Accordingly, there is a genuine issue of fact to support the second prong of Carini's *prima facie* case as to an adverse action.

Moreover, not only is there a genuine issue of fact concerning whether Carini's transfer to the second shift was itself an adverse action but there is also a genuine issue concerning whether this transfer over time amounted to yet a more severe type of adverse action in the form of a constructive discharge. An employer constructively discharges an employee if "(1) the employer intentionally created the complained of work atmosphere, (2) the work atmosphere was so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign, and (3) the plaintiff in fact resigned." *Karagozian v. USV Optical, Inc.*, 335 Conn. 426, 430 (2020).

There is at least an issue of fact as to whether Carini's circumstances rose to this level. Corcoran intentionally reassigned Carini to a later shift, even though Carini apparently told her at the time (and during his job interview) that he was not supposed to drive at night. She then rejected repeated requests to reverse that decision, and Carini was not allowed to carpool with another employee.[36]

Viewed in the light most favorable to Carini, the record shows that Carini was put in a position where he had to resign in order to protect his basic physical safety. He testified that "I try not to drive at all at night," because "[i]t's a recipe for disaster."[37] He further testified that his 45-minute "commute would be dangerous" and, then when asked if his doctor advised him about "the types of jobs that it is safe for you to perform," the doctor "said construction was fine as long as I'm not driving at night."[38] *See Santana v. Rent A Throne, Inc.*, 2018 WL 1027667, at *8 (E.D.N.Y. 2018) (issue of fact as to whether employee allegedly forced to drive unsafe trucks was constructively discharged). Although the company faults Carini for failing to raise his

---

[36] Doc. #31-4 at 76, 80, 140.
[37] *Id.* at 72.
[38] *Id.* at 78.

14

concerns with its human resources department before resigning, it does not cite authority for the proposition that he was required to exhaust his administrative remedies within the company prior to leaving his employment or filing this lawsuit.

As to the third element of the *prima facie* case (that there was a causal connection between the protected activity and the adverse action), the conversation with Petrosky, rejected dinner invitation, and shift reassignment all occurred in quick succession. Carini testified that his conversation with Petrosky occurred shortly before he rejected Corcoran's dinner invitation, and that he was moved to the second shift about a week after declining that invitation.[39] The Second Circuit has ruled that "even without direct evidence of causation, a plaintiff can indirectly establish a causal connection to support a . . . retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013). Thus, in *Zann Kwan*, the Second Circuit held that "[t]he three-week period from [a plaintiff's] complaint to her termination is sufficiently short to make a *prima facie* showing of causation indirectly through temporal proximity." *Ibid.* Accordingly, there is a genuine issue of fact to support the third prong of Carini's *prima facie* case as to causation.

The company mischaracterizes the record by claiming that "[p]ursuant to Plaintiff's own deposition testimony, he was not transferred to a second shift due to any rejection of invitation from Ms. Corcoran."[40] The passages of Carini's deposition cited by the company reflect only the reason stated by Corcoran to Carini for the shift change ("we need help on second shift"), not Carini's agreement with that reason.[41] The company's argument ignores other parts of Carini's

---

[39] Doc. #31-4 at 62-63.
[40] Doc. #36 at 4 (citing Doc. #31-4 at 70, 80).
[41] Doc. #31-4 at 70, 80.

15

deposition in which he claimed—and the company's counsel even articulated her understanding of that claim—that Corcoran switched his shift because he had just rejected her dinner invitation.[42]

With Carini's *prima facie* case established, the burden shifts to the company to provide a non-retaliatory explanation for the adverse action. It has done so. It claims that Carini was reassigned to the late shift on a temporary basis because of an unexpected staffing shortage.[43]

In light of the company's proffer of a non-retaliatory explanation, the burden shifts back to Carini to adduce enough evidence to sustain a jury verdict in his favor. Carini must point to evidence to show that he would not have been transferred to and kept on the second shift but for the company's intent to retaliate against him for engaging in protected activity

Carini has carried his burden. According to Carini, he was led to believe the shift reassignment was only temporary and that he would return to the first shift after a replacement was found.[44] But then Corcoran allegedly changed her tune, telling Carini that he could only escape the second shift by resigning.[45] This evidence is enough to undermine the company's explanation that he was transferred to the second shift only because of a temporary staff shortage and to suggest—for reasons beyond mere temporal proximity—that Corcoran was acting for vindictive reasons stemming from Carini's complaint to Petrosky and/or his rejection of her dinner invitation. *See Zann Kwan*, 737 F.3d at 846 (noting that "[a] plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses,

---

[42] Doc. #31-4 at 62 ("[S]he would constantly try to hang out with me, like at one point she said, let's go to dinner and that's when I said, I don't really want to do that, I have a girlfriend, I'm not really interested in you like that. And then a week later I was on second shift so . . ."); *id.* at 86 (company counsel stating in part as preface to a question that "in terms of your feeling that your supervisor had changed you to a shift that was not safe for you to perform and that you believe she did that because you had rejected her requests for dinner . . . .").
[43] Doc. #28-1 at 22; Doc. #28-2 at 2 (¶ 14).
[44] *Id.* at 76, 140.
[45] *Id.* at 139.

implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action" and that "[f]rom such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason."); *see also Bart v. Golub Corp.*, 96 F.4th 566, 575 (2d Cir. 2024) ("A plaintiff instead need only show that the employer's stated reason—even if true or factually accurate—was not the 'real reason,' in the sense that it was not the *entire* reason due to a coexisting impermissible consideration.").

I understand the company's concerns that Carini's deposition testimony is somewhat vague and indefinite, but on balance I think it is specific enough to carry his burden and must be credited in light of my obligation at this stage of the proceedings to construe the facts in the light most favorable to Carini. The uncertainties in Carini's deposition testimony suggest fertile grounds for cross-examination but are not enough to warrant a summary dismissal of his claims.

In short, there is a genuine issue of fact to support Carini's claim that the company retaliated against him for engaging in protected activity to oppose unlawful sexual harassment. Accordingly, I will deny the company's summary judgment motion as to Carini's retaliation claim insofar as it is based on his opposition to sexual harassment.

### *Disability discrimination (Count Three)*

Count Three of the complaint alleges that the company discriminated against Carini because of his disability. Courts analyze claims for disability discrimination using the same *McDonnell Douglas* burden shifting framework as discussed above. *See Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 71 (2d Cir. 2019). Here, a *prima facie* case consists of demonstrating (1) that Jacobs is subject to CFEPA, (2) that Carini had a disability within the meaning of CFEPA, (3) that Carini was otherwise qualified to perform the essential functions of his job, and (4) that Carini suffered an adverse employment action because of his disability. *Ibid.*

The first three elements of the *prima facie* case are not in doubt here. The company does not contest that it is covered by CFEPA, that Carini's narcolepsy is a disability, or that Carini was qualified to perform the essential functions of his job. Instead, the company argues that Carini did not suffer an adverse employment action, and that there is no evidence of discriminatory intent.[46]

I conclude for all the reasons discussed above with respect to Carini's retaliation claim that there is a genuine issue of fact to show that Carini was subject to an adverse employment action. The adverse action was his switch to the second shift and his constructive discharge.

I conclude as well that there is a genuine issue of fact concerning discriminatory intent. There is evidence that Corcoran knew of Carini's narcolepsy at the time he was hired and before switching him to the second shift. And there is evidence that Corcoran knew of Carini's narcolepsy when refusing to switch him back to the first shift. An employer's failure to provide an accommodation may be evidence that an employer "also acted adversely against the employee because of the individual's disability." *Finan v. Good Earth Tools, Inc.*, 565 F.3d 1076, 1080 (8th Cir. 2009) (quoting *Kells v. Sinclair Buick-GMC Truck, Inc.*, 210 F.3d 827, 834 (8th Cir. 2000)). Even though there is evidence (as discussed above) that the company took these actions in order to retaliate against Carini for opposing sexual harassment, a jury could also or alternatively conclude that the company switched him to the second shift because it intended to exploit his narcoleptic condition and to create conditions that would lead to him resigning his employment.

Although the company proffers the same non-discriminatory reason for its action (a temporary staffing shortage), I conclude for the same reasons discussed above that a jury could

---

[46] Doc. #28-1 at 23-25.

reasonably conclude that this reason was a pretext or incomplete and that the company would not have switched Carini to the second shift and refused to transfer him back to the first shift but for its knowledge of his disability. Accordingly, I will deny the company's motion for summary judgment as to Carini's claim for disability discrimination.

### *Failure to accommodate disability (Count Four)*

Count Four alleges a claim for failure to accommodate Carini's disability. Unlike Carini's claim as alleged in Count Three that he was subject to disparate treatment because of his disability, Carini's claim for a failure-to-accommodate as alleged in Count Four does not require evidence of disparate treatment or a discriminatory motive. *See Betances v. MetroPlus Health Plan, Inc.*, 2021 WL 2853363, at *7 (S.D.N.Y. 2021). Instead, Carini must show that "(1) he is disabled within the meaning of the ADA [or CFEPA]; (2) his employer is a covered entity; (3) he could perform the essential functions of his job with an accommodation; and (4) the defendant[] refused to provide such an accommodation despite being on notice." *Fox*, 918 F.3d at 73.

The company only contests the second and fourth elements of this test. It argues that Carini did not share his inability to drive at night with the company, and that Carini did not request an accommodation.[47] I do not agree. Carini testified both that he disclosed his disability to Corcoran and that he repeatedly asked (without success) to be returned to the early shift.[48] He further testified that during his job interview, he told Corcoran and Petrosky that he "had narcolepsy and can't drive at night."[49]

In short, there is at least a genuine issue of fact as to whether the company had notice of Carini's narcolepsy and as to whether it refused to accommodate that disability. Accordingly, I

---

[47] Doc. #28-1 at 25-27.
[48] Doc. #31-4 at 71, 76, 80, 140.
[49] *Id.* at 71.

will deny the company's motion for summary judgment as to Carini's failure-to-accommodate claim as alleged in Count Four.

## CONCLUSION

For the reasons set forth above, the Court GRANTS in part and DENIES in part the company's motion for summary judgment. The Court GRANTS the motion in part insofar as Count Two alleges a claim for disability retaliation. The Court otherwise DENIES the motion as to all of Carini's other claims for a sexually hostile work environment (Count One), retaliation for opposing sexual harassment discrimination (Count Two), disability discrimination (Count Three), and failure-to-accommodate a disability (Count Four).

It is so ordered.

Dated at New Haven this 18th day of September 2024.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge